# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3696 | **DATE** | 2/15/2001 |
| **CASE TITLE** | Archie Robinson vs. City of Harvey and Officer Manuel Escalante | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motions for summary judgment [37-1], [38-1], are denied as to Counts I, II, and V of the complaint. Plaintiff having withdrawn Counts III and IV of the complaint, Counts III and IV are dismissed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | FEB 16 2001 date docketed | |
| | Notified counsel by telephone. | | | 77 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 2/15/2001 date mailed notice | |
| MD | courtroom deputy's initials | | MD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ARCHIE ROBINSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 99 C 3696 |
| | ) |
| CITY OF HARVEY and | ) |
| OFFICER MANUEL ESCALANTE, | ) |
| | ) |
| Defendants. | ) |

**DOCKETED**
**FEB 16 2001**

## MEMORANDUM OPINION AND ORDER

Plaintiff Archie Robinson ("plaintiff") filed a six count complaint against defendants City of Harvey ("the City" or "Harvey") and Officer Manuel Escalante ("Escalante"). Count I is against both defendants for excessive force in violation of 42 U.S.C. § 1983; count II is against the City for deprivation of necessary medical care also in violation of § 1983; counts III and IV have been withdrawn; count V is a supplemental state law claim against Escalante for malicious prosecution; and count VI is a supplemental state law claim against the City for indemnification in the event judgment is entered against Escalante. The City moves for summary judgment on counts I, II, and III, and Escalante moves for summary judgment on count I and V. As plaintiff has withdrawn counts III and IV, these counts will be dismissed, and for the reasons articulated below, the court denies summary judgment on counts I, II, and V.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

77

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**FACTS**

**Events Surrounding the Shooting**

Plaintiff's Version

On September 3, 1997, plaintiff, who was then nine days shy of his 20th birthday, unarmed, and had no criminal record, paid a visit to his classmate Mecca Eves ("Eves") at an apartment complex located at 14721 Vail Street in Harvey, Illinois. At this time, Officers Escalante and Williams were Harvey police officers known to be members of Harvey's "Special Operations Group," a group the public came to call the "Jump Out Boys."[1] After leaving Eves'

---

[1]Officer Edison Torres testified at his deposition that the Special Operations Group handled search warrants, conducted regular patrols, and was dispatched to investigate any gang activity. Plaintiff, at his deposition, described the Jump Out Boys as plain clothes officers who jumped out of cars when they saw people congregated. Plaintiff also testified that the police
(continued...)

2

apartment to go to a store, plaintiff stopped outside the apartment building and briefly spoke with Anthony Reynolds ("Reynolds"). While in conversation with plaintiff, Reynolds abruptly stopped talking, adopted a surprised look on his face, and began to run away. Plaintiff also started running, and both plaintiff and Reynolds ran north along Vail street until they approached a picket fence. Reynolds reached the fence first and climbed over. Plaintiff also started climbing the fence even though he could not see what was located on the other side. Plaintiff's foot became stuck on the top of the fence, but he managed to pull his leg free. After plaintiff landed on the ground, he slipped in the mud and then jumped back onto the fence. While plaintiff was on the fence this second time, Escalante shot plaintiff in the buttocks with a .45 caliber revolver with the intention of using deadly force. After Escalante shot plaintiff, plaintiff blacked out, flipped over the fence and fell to the ground on the west side of the fence. Williams arrived on the west side of the fence within seconds of the shooting and called for an ambulance on his police radio, stating that he needed assistance for a "battery victim." (Pl.'s Statement of Additional Facts ¶ 28.) Williams also looked through a missing fence panel, did not see a gun on the ground on the east side of the fence the first time he looked through the fence, but did see a gun the second time he looked through the fence. Before Williams looked through the fence a second time, a detective who had joined Escalante and Reynolds on the east side of the fence saw a gun. Escalante never saw a gun on the ground. The area on the east side of the fence consisted mostly of sparsely located packed-down grass and dirt that would not have concealed a weapon. In addition, the area had not yet been secured when Williams looked through the fence a second

---

[1](...continued)
officers would refer to themselves as the Jump Out Boys as well.

3

time and saw the gun on the ground. "Nothing changed about the position of Williams, Escalante, and Reynolds vis a vis the fence between the first and second times Williams looked through the fence," and "Williams had a clear line of sight to where the gun was laying." (*Id.* ¶ 37.) A .22 caliber handgun with a broken grip was recovered on the ground.

No one arrested plaintiff at the scene of the shooting. At the same time an ambulance arrived, Officer Torres ("Torres"), who had heard the ambulance call over his police radio, arrived at the scene and approached Escalante. Escalante then told Torres that he had shot someone who had pointed a gun at him. Sargent Wells ("Wells"), who was summoned to the scene after the shooting, told Williams to secure the area, which involved placing police tape around and keeping people away from the secured area. Although the fence was sufficiently lit, Wells never saw the gun Escalante claimed plaintiff pointed at him. While plaintiff was in the ambulance, Escalante told other officers that plaintiff had had a gun. In addition, another Harvey police officer also known to be a member of the Jump Out Boys asked plaintiff while he was on the ambulance whether plaintiff had really had a gun. Plaintiff was then taken to a hospital by the ambulance and treated there for his gunshot wound.

Defendants' Version

On September 2, 1997, Williams received a "lead" regarding illegal narcotics activity in the Vail Street area, and on September 3, 1997, Escalante, Williams, and Deputy Marshal LaDarryl White ("White") traveled around this area in unmarked police car (although the people in the area they were traveling in would have recognized it as a police car) pursuant to an investigation headed by Williams regarding the illegal narcotics activity. The officers planned to drive around the area, and once they arrived at the buildings located at 147th Street and Vail,

4

Escalante was to proceed to the rear of the buildings in the event people ran through a corridor between buildings. "Escalante's goal was to climb a fence in the rear of the buildings and meet any subjects in front of the building. Escalante sought to apprehend anyone fleeing the location, or recover narcotics that anyone attempted to drop and hide." (Escalante's Statement of Material Facts ¶ 14.) When Escalante, Williams, and White arrived at 147th and Vail, Williams and White proceeded toward a crowd of people and Escalante ran northbound along a back alley. Escalante then encountered a wooden fence and attempted to jump over the fence. At the same time the officers arrived, plaintiff and Reynolds, with Reynolds in front, began running from the police northbound along Vail Street and approached a wooden fence. Plaintiff and Reynolds were the only members of the crowd who ran when the police arrived, and Williams pursued them northbound along Vail Street. Reynolds and plaintiff jumped over the fence landing on the fence's eastside. Escalante, who was on the eastside of the fence trying to climb over to the fence's westside, encountered Reynolds on top of the fence and then encountered plaintiff. Escalante ordered plaintiff and Reynolds to stop, to which Reynolds responded, "fuck that," and then jumped on top of Escalante. Escalante struggled with Reynolds and while attempting to hold Reynolds, Escalante ordered plaintiff to stop. Plaintiff failed to stop and, instead, jumped upon Escalante. Escalante then pushed plaintiff against the fence, and plaintiff attempted to climb back to the westside of the fence. Escalante tried pulling plaintiff down by his pants and, at the same time, continued to struggle with Reynolds who was trying to knock Escalante down. While Escalante tugged at his pants, plaintiff removed a handgun from his pants and pointed it towards Escalante's face. Escalante released plaintiff's pant legs, stepped back from plaintiff and ordered plaintiff to drop the gun. When plaintiff failed to comply, Escalante shot plaintiff from a

5

distance of approximately one and one half feet. While on the west side of the fence, Williams heard scuffling on the east side and also heard Escalante say "Get down, get down! Police, police." (*Id.* at 29.)

After Escalante shot plaintiff and plaintiff fell onto the west side of the fence, Escalante told Williams that plaintiff had a gun. Williams looked at plaintiff's hands and the grass surrounding plaintiff, saw no gun, and handcuffed plaintiff. Williams then looked through a hole in the fence and saw Escalante and another suspect. The second time Williams looked through the fence he saw a gun on the ground. Escalante recovered cannabis from Reynolds after handcuffing him.

**Treatment of Plaintiff's Gunshot Wound**

At approximately 11:00 p.m. on September 3, 1997, plaintiff was taken from the hospital to the Harvey Police Department and placed in a cell. At approximately 4:30 a.m. on the following morning, the Illinois State Police Public Integrity Task Force ("PITF") interviewed plaintiff, and an ambulance was called to further treat plaintiff after the interview because plaintiff was still bleeding and blood had soaked through his bandage. The medical personnel changed plaintiff's bandage and told him that if the wound started bleeding again, he should tell one of his jailors to bring him to the hospital and have his wound stitched up. Plaintiff informed one of the jailors that his bandage was saturated with blood and showed the jailor his blood-soaked bandage when the jailor brought plaintiff breakfast later that morning. The jailor told plaintiff that he would call an ambulance for him. Because no medical personnel came to see plaintiff, plaintiff later told a Harvey employee sitting at the main desk approximately 15-20 feet from plaintiff's cell that he was still bleeding. Plaintiff called out twice to the Harvey employee

6

at 11:00 but received no response. Plaintiff's wound continued to bleed, the blood soaked through plaintiff's jeans, and plaintiff became too weak to stand. As a result, plaintiff alternatively knelt on the floor and laid flat on his stomach. Plaintiff received no response to his calls for medical attention until other people in lock-up began crying out that there was a bleeding man with them. An ambulance was called at approximately 4:00 p.m. and plaintiff was again treated. Plaintiff was transported to the Markham courthouse at approximately 4:00 a.m. and released at 10:00 a.m. the following morning (September 5, 1997). After his release, plaintiff went to Ingalls Hospital's emergency room and received additional medical treatment.

**Post-Shooting Investigations**

Torres testified at his deposition that several weeks after the shooting, Officer Jeleniewski, another Harvey police officer, told Torres that he believed that the gun found at the scene of the shooting had been planted post-shooting after other officers had arrived. Torres stated that he understood Jeleniewski to be saying that Williams had confessed that someone other than plaintiff had brought the gun to the scene of the shooting and that Jeleniewski was accusing either Torres or Escalante of planting the gun. Torres also claims he later confronted Williams about the alleged confession but Williams denies both that he confessed and that he ever spoke with Torres about this issue. Instead, Williams testified at his deposition that he stated to several people that he did not see a gun in plaintiff's hand. The Illinois State Police interviewed Harvey Police Commander Damiani ("Damiani"), the commander in charge of the Internal Affairs Division, resulting in a written investigative report that states, in part, that

> Jeleniewski had a conversation with Harvey Police Officer Montell Williams. Williams had allegedly told Jeleniewski that Williams thought the gun recovered in the Archie Robinson shooting might have been seized on a raid earlier that

7

month. Williams had allegedly told Jeleniewski that Williams had never seen the
gun until after Officer Edison Torres was on the scene and Williams thought
Torres might have planted the gun.

(*Id.* ¶ 51, Ex. W.) The forensic scientist who tested the gun at a police laboratory found no evidence that plaintiff had touched the gun,[2] and a laboratory hired by plaintiff to evaluate the gun also found "no fingerprint evidence which would substantiate the fact that the weapon was handled." (*Id.* ¶ 67, Ex. M.)

**Prosecution of the Unlawful Use of a Weapon Charge**

Escalante drafted a police report on September 3, 1997 stating that plaintiff had pointed a gun in Escalante's face, and Williams also included Escalante's version of the events in his police report. Escalante also spoke to Assistant State's Attorney Golden ("Golden") on the night of the shooting and told Golden that he believed that plaintiff had committed a felony. Golden ultimately decided to charge plaintiff with unlawful use of a weapon. Assistant State's Attorney McQuaid, the attorney who prosecuted the state's case against plaintiff, also reviewed the police reports. In 1997, the charge of unlawful use of a weapon was a class four felony carrying a minimum sentence of one year and a maximum sentence of three years, along with a potential $25,000 fine, and Escalante understood that the conduct of which he accused plaintiff could have resulted in a felony conviction.

---

[2]The following exchange took place at Forensic Scientist Wilburn Wilkens' deposition:

Q. So is it fair to say that you have no evidence that you can give us that Archie Robinson touched this gun?
A. That is correct, and the other way also. I have no way to tell if he touched the gun or he didn't touch the gun.

8

Escalante appeared, pursuant to a subpoena, at plaintiff's criminal trial for the unlawful use of a weapon on November 18, 1998 even though he was no longer a Harvey police officer. Because Escalante no longer worked as a Harvey police officer, he did not bring the gun to the trial. When McQuaid expressed concerns about prosecuting without any evidence, Escalante attempted to persuade McQuaid to go forward with the case. McQuaid, who had only 30 minutes to review the criminal file prior to trial, neither called Escalante to testify nor attempted to produce the allegedly retrieved gun at trial. Instead, the trial proceeded by stipulation, an uncommon procedure for a felony prosecution. Plaintiff was acquitted after trial.

**Escalante's Background**

Before becoming a Harvey police officer, Escalante pled guilty to a crime involving the fraudulent display of license plates, was charged with battery, and either pled guilty to or was found guilty of the unlawful use of a weapon (the record is unclear), for which he received one year probation for the unlawful use of a weapon. In addition, the Chicago Police Department rejected Escalante's application for employment because he scored too low on a required examination for employment. (Torres also failed another police department's written test for employment but passed Harvey's test.) At the time of plaintiff's shooting, Escalante was still completing the certification process to work as a part-time officer within the State of Illinois. Escalante failed the certification examination on February 9, 1998. In December, 1999, Escalante was making $5.25 an hour with the Harvey Police Department.[3]

---

[3]Escalante testified at his deposition that his starting hourly salary with the Harvey Police Department was $5.20 or $5.25 and that at some point it went up to $6.25 or $6.75. The parties do not indicate when Escalante left the Harvey Police Department or when he returned. In addition, although Escalante is referred to as an "officer," technically, he was hired as a "deputy
(continued...)

9

**Internal Affairs' History of Handling Excessive Force Complaints**

From 1994 to 1998, Roy Wells ("Wells") served as a patrol sergeant responsible for supervising patrol officers and answering citizen complaints. He testified at his deposition to the following regarding citizen complaints of police misconduct:[4] The first person to deal with the complaint is the patrol sergeant on duty. There are no written guidelines for determining whether a complaint is handled by a patrol sergeant or whether the complaint is passed on to Internal Affairs, and it is entirely up to the patrol sergeant's unreviewed and undocumented discretion to decide when a complaint is referred to Internal Affairs. This manner of handling citizen complaints could be fairly described as the Harvey Police Department's policy on the subject. Of the citizen complaints handled by Wells, about one third were referred to Internal Affairs and about one third were handled at the patrol sergeant level. This is consistent with Harvey's policy for handling such complaints. There are no files for the complaints handled at the patrol sergeant level, but, at times, Wells would take notes of the interview with the complaining citizen. These notes are not kept in any particular place in Wells' desk and sometimes the notes are thrown away immediately. Sometimes Wells kept a note containing the complaining citizen's name, address, and phone number. These notes would be thrown away, however, after Wells contacted

---

[3](...continued)
marshal," a position with more limited responsibilities than a part-time police officer, because he had not passed the Illinois' certification exam.

[4]Defendants submitted an unsigned, undated affidavit purportedly from Wells that states that complaints are only referred to and handled by him on nights and weekends when the Internal Affairs' Office is closed, that he never handles complaints of excessive force, and that his deposition testimony stating that he investigated some excessive force complaints referred to investigations made from 1992 to 1994 while he was an Internal Affairs investigator. The court disregards this evidence. *See Sellers* v. *Henmam*, 41 F.3d 1100, 1101 (7th Cir. 1994) (unsigned affidavits are likewise unsworn and subject to being stricken).

the citizen to let her or him know that he had spoken to the officer who was the subject of the complaint and that the situation had been resolved. If Wells resolved a complaint in favor of the police officer, Wells informed the citizen that she or he could take the matter up with Internal Affairs. Also, there is a sign posted on the station's front desk window informing citizens that they can contact Internal Affairs. About two or three times a year, Wells would write an internal memorandum to Internal Affairs regarding a complaint even though it had been resolved at the police sergeant level. Wells had handled excessive force complaints and, at times, determined that such a complaint was unfounded.

Damiani and Chief Hardiman, the Chief of the Harvey Police Force at the time of plaintiff's shooting ("Hardiman"), testified to one or more of the following facts at their depositions: Twenty to thirty percent of arrests result in excessive force claims, although not all are reduced to writing. In 1996 and 1997, there were 24 Internal Affairs investigations of citizen excessive force complaints, and none of the complaints was sustained. Every excessive force complaint is sent to Internal Affairs for investigation,[5] and a log exists for noting excessive force complaints, although some complaints are not credible enough to be entered into this log. Some complaints are turned into case reports at an investigator's unreviewed and undocumented discretion. In addition, not all departmentally created requests for disciplinary action against an officer are retained (specifically, when the deputy chief –the only person allowed to give disciplinary action– decides that an officer should not be disciplined, the request is thrown away), but a record is kept when disciplinary action is taken. No member of the Harvey Police

---

[5]Hardiman testified that he was not aware of the police sergeant screening process described by Wells, that such a process is improper, and that all excessive force complaints are investigated.

11

Department has been disciplined for use of excessive force since the time Hardiman was hired through the time of plaintiff's shooting, and neither Escalante nor Torres has any knowledge of being the object of an Internal Affairs investigation regarding excessive force. About half of people shot by police officers accuse the police department of planting guns at the scene of the shooting.

## DISCUSSION

**Count I: Excessive Force**

<u>Escalante</u>

An officer uses excessive force when his or her actions are objectively unreasonable in light of all the circumstances surrounding the incident. *See Estate of Philips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). To determine the reasonableness of an officer's actions, this court must pay "careful attention to the facts and circumstances of [the] case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000) ("In the end, the excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed–to the community or to the arresting officers–if left unattended.") (internal quotation marks and citations omitted). When the use of deadly force is at issue, an officer's use of such force in apprehending a suspect is only reasonable when the officer has probable cause to believe that the suspect is dangerous or has committed a violent crime. *See Jacobs*, 215 F.3d at 774; *McDonald v. Haskins*, 966 F.2d 292, 294-95 (7th Cir. 1992).

12

There is no dispute that Escalante shot plaintiff with the intention of using deadly force. An obvious fact issue exists, however, as to whether plaintiff was dangerous. If plaintiff had no gun, then he posed no danger to Escalante or any one else. Neither do defendants contend that anyone believed plaintiff had committed a violent crime prior to Escalante shooting him. "In essence, what we have here is a credibility question" not appropriately decided on a motion for summary judgment. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (§ 1983 excessive force claim where officer and plaintiff recounted significantly different versions of the facts involved). A material fact issue therefore exists. Indeed, Plaintiff's testimony alone appears to be enough to create a factual dispute. As the Seventh Circuit reiterated in *Miller*, this court cannot weigh the evidence or the credibility of witnesses. *Id.* And contrary to Escalante's argument, the record, in addition, reveals more than unsubstantiated rumor and speculation. Plaintiff testified that he did not have a gun; Williams did not see a gun in plaintiff's hand when he fell over the fence; neither did Williams see a gun when he first looked on the ground and through the fence; the forensic scientist who tested the gun could find no evidence that plaintiff had touched the gun.

Moreover, since this court has determined that a fact issue exists as to whether Escalante used excessive force when he shot plaintiff, Escalante's argument that he is entitled to qualified immunity necessarily fails. Escalante would be entitled to qualified immunity only if the circumstances surrounding the shooting "would not have alerted a reasonable officer that his acts could be deemed an application of excessive force." *McNair v. Coffey*, 234 F.3d 352, 355 (7th Cir. 2000). If a jury might find Escalante's actions objectively unreasonable, then this court cannot say Escalante is entitled to qualified immunity at this juncture. *See Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) ("Raising a defense of qualified immunity in the face

13

of disputed facts that control the answer to the question is a waste of everybody's time."). *See also Omdahl v. Lindholm*, 170 F.3d 730, 734 (7th Cir. 1999) ("[W]hether the [plaintiffs] can establish the existence of a constitutional violation turns on how a fact-finder resolves the question of fact regarding deadly force. The existence of a factual dispute prevents us from resolving the issue.").[6]

City of Harvey

Even if Escalante is found at trial to have used excessive force, *respondeat superior* is not a viable theory of recovery from the City under § 1983. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). Instead, the City must have in place an official policy that deprived plaintiff of his constitutionally protected right to be free from Escalante's use of excessive force. *See Id.* at 694. Plaintiff's response to the City's motion and materials submitted in support of the response indicate that he is attempting to establish liability against the City based on "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

---

[6]Escalante's opening brief argues that he is also entitled to immunity under the Illinois Tort Immunity Act. The complaint pleads no state law battery claim, so this act does not apply. *See Payne v. Churchich*, 161 F.3d 1030, 1038 (7th Cir. 1999) (district court erred in dismissing claims against the county and sheriff on the ground that they enjoyed absolute immunity as a matter of state law under the Illinois Tort Immunity Act. " Immunity on the federal claims, those brought pursuant to 42 U.S.C. § 1983 in this case, is a matter of federal law."); *Kelm v. Arlington Heights Park Dist.*, 1999 WL 753930, *5 (N.D.Ill.) ("a federal cause of action, here the Section 1983 civil rights claim, pre-empts a state tort immunity statute").

14

The record reveals that decisions of whether to investigate excessive force complaints are often unreviewed and undocumented, and no written guidelines exist for handling such complaints. A fact finder might conclude, therefore, that the City takes a lax attitude toward excessive force complaints and that Escalante's actions conformed with a policy of not disciplining officers who use excessive force when apprehending suspects. In addition, the fact that 24 investigations of excessive force complaints filed between 1995 and 1997 resulted in no discipline could also lead a fact finder to the conclusion that the City had a policy ignoring excessive force violations. Further, plaintiff has submitted an expert report concluding that the Harvey Police Department

> ... has systemic deficiencies in its administrative investigations of use of force and citizens' complaints alleging improper use of force. These systemic deficiencies were so pervasive and pretextual that any reasonable officer in such a police agency would be aware of the significant failures of these critical administrative investigations and would feel comfortable that field misconduct, particularly use of unreasonable force, would not be discovered, would be minimized or would not result in any significant sanction. These systemic failures by the Harvey Police Department appeared to be conscious departures from generally accepted practices within law enforcement.

(Pl.'s Supp. Resp. Ex. A.) As such, a genuine fact issue exists and summary judgment on count I against the City is likewise inappropriate.

**Count II: Deprivation of Necessary Medical Care**

In count II, plaintiff alleges that the City had a widespread practice of depriving pre-trial detainees of necessary medical care. Pursuant to the Fourteenth Amendment's Due Process Clause, a pre-trial detainee has a right to be free from any punishment prior to an adjudication from guilt, not just cruel and unusual punishment prohibited by the Eighth Amendment. *See Brownell* v. *Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). "Prohibited punishment has been held to

15

include deliberate indifference to the serious medical needs of pretrial detainees." *Id. See also Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995) ("Pretrial detainees, who are protected by the Due Process Clause, will state a claim for inadequate medical treatment if they allege deliberate indifference to their serious medical need.") (citations, internal quotation marks, and alterations omitted). A "[Due Process] claim [alleging inadequate medical care] is analyzed the same way as a claim under the Eighth Amendment to determine whether the officials showed deliberate indifference to serious medical needs." *Chavez v. Cady*, 207 F.3d 901, 904 (7th Cir. 2000). *See also Higgins v. Corr. Med. Servs. of Illinois, Inc.*, 178 F.3d 508, 511 (7th Cir. 1999) ("Under the Fourteenth Amendment, a claim for denial of medical services is analyzed under the Eighth Amendment standards."). Deliberate indifference cannot be found "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The City relies on *Thomas v. Pate*, 493 F.2d 151 (7th Cir. 1974) to support its conclusion that plaintiff's medical condition was not sufficiently serious to invoke the protection of the Due Process Clause. In *Gutierrez v. Peters*, 111 F.3d 1364, 1370 (7th Cir. 1997), however, the Seventh Circuit explained that it was skeptical of the pre-*Estelle v. Gamble*, 429 U.S. 97 (1976), framework enunciated in *Thomas*. The Seventh Circuit noted that post-*Estelle* decisions issued by the Seventh Circuit, "as well as those of the other circuit courts, have repeatedly recognized that delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims." *Gutierrez*, 111 F.3d at 1371. Here, the City failed to rebut plaintiff's claims that he twice asked for medical assistance for a gunshot wound that was bleeding so

16

profusely as to saturate a bandage and bleed through plaintiff's jeans, that plaintiff was too weak to stand, and that a period of at least five hours elapsed between the time plaintiff asked for medical attention and received treatment. And with regard to the City's liability based on a widespread practice of deliberate indifference, Hardiman gave conflicting testimony over whether specific medical guidelines exist for determining whether a pre-trial detainee will receive medical attention and there is no indication that a pre-trial detainee's request for medical attention is ever documented. It may be possible, therefore, for a fact-finder to infer that the City had a custom of deliberately ignoring requests for needed medical care, and summary judgment is likewise inappropriate for count II.

**Count V: Malicious Prosecution**

In order to withstand Escalante's motion for summary judgment on count V, plaintiff "must provide some evidence that (1) he has satisfied the requirements of a state law cause of action for malicious prosecution; (2) a state actor committed the malicious prosecution; and (3) he was deprived of liberty." *Cervantes v. Jones*, 188 F.3d 805, 809 (7th Cir. 1999). The parties argue over element (1), whether plaintiff provided enough evidence to create a fact issue regarding satisfaction of Illinois' requirements for a malicious prosecution action. Malicious prosecution in Illinois requires "(1) the commencement or continuance of an civil or criminal judicial proceeding by the defendant, (2) the termination of the proceeding in the plaintiff's favor, (3) the absence of probable cause for the proceeding, (4) the presence of malice, and (5) damages to the plaintiff resulting from the commencement or continuance of that proceeding." *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 840 (Ill. App. Ct. 2000); *see also*

17

*Cervantes*, 188 F.3d at 809. A genuine issue of material facts exists as to whether plaintiff can satisfy these requirements.

There is no argument that Escalante is immune from suit here or that plaintiff did not prevail at his criminal trial. In addition, Escalante's court submissions do not take up the issue of damages. Instead, Escalante argues about probable cause and malice. First, this court agrees with plaintiff that Escalante mischaracterizes plaintiff's claim. Escalante argues that he had probable cause to arrest plaintiff because, *inter alia*, plaintiff fled when police arrived where plaintiff was congregating with Reynolds. This argument misses the point. The pertinent inquiry is whether Escalante had probable cause to subject plaintiff to a judicial proceeding for the unlawful use of a weapon. If plaintiff had no gun, then, of course, Escalante had no probable cause to "actively instigate[] or encourage[] the prosecution of . . . plaintiff." *Cervantes*, 188 F.3d at 810 (internal quotation marks and citations omitted). In fact, if plaintiff had no gun, then Escalante repeatedly lied when he completed his police report and when he encouraged McQuaid to proceed with the case against plaintiff. Whether plaintiff possessed a gun is, as explained above, a credibility question to be resolved by a fact-finder and not by the court on summary judgment. Second, if plaintiff had no gun, then Escalante's behavior in instigating and encouraging his prosecution was malicious. For these reasons, summary judgment is denied on count V.

## CONCLUSION

Plaintiff withdrew counts III and IV of his complaint, and these counts are therefore dismissed. For the above stated reasons, the court denies summary judgment on counts I, II, and V.

Date: February 15, 2001         Enter: *Joan H. Lefkow*
                                JOAN HUMPHREY LEFKOW
                                United States District Judge

18